IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------ :
SELECTIVE INSURANCE COMPANY : CASE NO. 5:12-cv-02126
OF THE SOUTHEAST, :
 :
 : MEMORANDUM OF OPINION AND
            Plaintiff, : ORDER
 :
        -vs- :
 :
 :
 :
RLI INSURANCE COMPANY, :
 :
            Defendant. :
------------------------------------------------------ :

UNITED STATES DISTRICT JUDGE LESLEY WELLS

  Before the Court is a motion for partial summary judgment filed by plaintiff Selective Insurance Company of the Southeast ("Selective") and a motion for summary judgment filed by defendant RLI Insurance Company ("RLI"). Selective also moves the Court for an order granting certification of state law issues to the Ohio Supreme Court. For the reasons that follow, Selective's motion for partial summary judgment is granted; RLI's motion is denied; and the motion to certify state law issues is denied as moot.

**I.**

  This coverage dispute arises from the wrongful conviction of Clarence Elkins, who, after spending several years in prison, was exonerated of rape and murder based on DNA evidence. Mr. Elkins sued the City of Barberton and its police officers, who had

pursued the criminal case against him, alleging violations of state law and his federal constitutional rights. The civil case was settled for $5.25 million. During the time period relevant to the instant matter, the City of Barberton had excess insurance policies through Selective and RLI, respectively. The RLI policy had a policy period from June 29, 1997 to June 29, 1998. The Selective policy had a policy period from June 29, 1998 to June 29, 1999. Selective contributed to the settlement, while RLI did not. RLI denied coverage on the ground that the malicious prosecution of Mr. Elkins did not "occur" during RLI's policy period.

Selective, having been assigned Barberton's rights under the policy, brought the instant lawsuit seeking contribution from RLI. The question presented on summary judgment is whether under Ohio law and in light of the relevant language of the insurance policies, the malicious prosecution of Mr. Elkins "occurred" for purposes of insurance coverage at the time charges were filed or at some other time. As described in more detail below, the Court holds that the filing of charges triggered coverage for Mr. Elkins' malicious prosecution claim.

*Investigation and Criminal Proceedings*

On June 6, 1998, Judith Johnson was raped and murdered, and her six-year-old granddaughter, Brooke Sutton, was raped and assaulted. (Doc. 1-1, ¶5). On June 7, 1998, Brooke Sutton identified her uncle Mr. Elkins as the perpetrator, and Barberton police officers arrested him. (Doc. 14-1, p. 51-52, 91). The parties do not dispute that Sutton's identification provided probable cause for Mr. Elkins' arrest. Mr. Elkins was indicted by a Summit County grand jury on June 10, 1998. (Doc. 1-1, ¶ 7).

During Mr. Elkins' trial, Brooke Sutton testified, and she identified Mr. Elkins as the assailant. (Doc. 12, ¶5). However, Mr. Elkins' defense team provided significant evidence of his innocence. Melinda Elkins, the daughter of the victim Judith Johnson and Mr. Elkins' wife, testified that Mr. Elkins had been at home with her more than forty miles away at the time the crimes occurred. Other witnesses provided alibi evidence as well. There was also evidence that the police had recovered hairs "from the anus of victim Johnson . . . [different] from victim Johnson . . . [that] did not match known head hair standards from subject [Clarence] Elkins." After hearing all the evidence, a jury convicted Mr. Elkins as charged on June 4, 1999, and he was sentenced to life in prison without parole. (Doc. 1-1, ¶ 8; Doc. 4, ¶ 8). The conviction was affirmed on appeal. See State v. Elkins, 9th Dist No. 21380, 2003-Ohio-4522.

On January 5, 1999, before the criminal trial, Barberton Police arrested Earl Mann for robbery. During his arrest, Mr. Mann, who was drunk at the time, asked the arresting officer, "Why don't you charge me with the Judy Johnson murder?" Believing that this apparently inculpatory statement would be of interest to the detective bureau, the arresting officer wrote an intradepartmental memo ("the Mann Memo") describing what Mann had said. Although the detective bureau allegedly received the Mann Memo, the memo was never disclosed to Mr. Elkins or his attorneys during his criminal trial.

In 2002, Brook Sutton recanted her testimony implicating Mr. Elkins in the crime, and Mr. Elkins later acquired additional evidence of his innocence. (Doc. 11-1, ¶41). Based on an analysis of male DNA evidence collected at the crime scene, Mr. Elkins' DNA was excluded from the DNA found there. In 2005, Mr. Elkins obtained a cigarette butt belonging to Earl Mann, who by coincidence was incarcerated in the same facility

that he was. (Doc. 11-1, ¶46). DNA from the cigarette butt matched DNA recovered from the victims' bodies and other areas at the crime scene. (Doc. 11-1, ¶48). After an investigation, the case against Mr. Elkins was dismissed and he was released. The State of Ohio awarded Mr. Elkins $1,075,000, after it was determined that he was a wrongfully imprisoned person. Earl Mann pled guilty to the murder of Judith Johnson.

*Mr. Elkins Civil Suit*

In 2006, Mr. Elkins filed a lawsuit in federal court against the City of Barberton and the police officers involved in the criminal investigation. See Elkins v. Summit Cnty., Ohio, No. 5:06-CV-3004, 2009 WL 1150114, at *12 (N.D. Ohio Apr. 28, 2009). Mr. Elkins alleged that his arrest, prosecution, and incarceration amounted to a violation of his due process right to a fair trial. Mr. Elkins also brought state law claims including false imprisonment, malicious prosecution, intentional infliction of emotional distress, and loss of consortium. (Doc. 11-1). In support of his claims, Mr. Elkins argued that the officers' investigation of the crime was flawed from its inception. He presented evidence that Brooke Sutton's identification of him as the perpetrator was questionable, since her identification of him transitioned from "somebody" killed her grandmother to someone who "sounded like Uncle Clarence" to someone who "looked like Uncle Clarence" to her testimony at trial that it was, in fact, Uncle Clarence who killed her grandmother. (Doc. 11-1, ¶¶25, 28).

Mr. Elkins presented evidence that the Barberton police ignored and failed to collect multiple pieces of bloody evidence, which included handprint and fingerprint evidence at the scene, Judith Johnson's bloody glasses, her dentures, a bloody polaroid camera, and a bed sheet that was beneath Ms. Sutton during her post-mortem

examination. (Doc. 11-1, ¶¶70-71, 76-78). There was evidence that the police instructed Judith Johnson's daughter to throw away a lampshade that had two bloody handprints on it. (Doc. 14-2, p. 10).

Mr. Elkins also presented the testimony of Judith Johnson's best friend, Beverly Kaisk, who claimed that Brooke Sutton told her that she did not know who committed the crime. (Doc. 11-1, ¶62). Ms. Kaisk reported this to the police, and she gave a recorded statement to a detective on June 8, 1998. (Doc. 11-1, ¶63). She testified that the detective altered her statement in his report to say that Brooke Sutton had confirmed that Elkins was the culprit. (Doc. 11-1, ¶64).

Mr. Elkins presented evidence that the investigating officers intimidated his alibi witnesses. There was evidence that on June 12, 1998, Sue Dalton informed officers that she had seen Mr. Elkins on the night of the murder and that she did not believe that he committed the crime. (Doc. 14-2, pp. 12-13). According to Ms. Dalton the officers responded, "we got our man, we know for a fact that we have our man." (Doc. 14-2, p. 12). When Ms. Dalton protested, the officers reportedly told her that she would end up in jail if she did not distance herself from Elkins. (Doc. 14-2, pp. 12-13).

Mr. Elkins also provided evidence that the police disregarded the lack of physical evidence tying Mr. Elkins to the crime. On June 16, 1998, a forensic scientist sent a report to the Barberton Police department regarding foreign pubic hair and foreign head hair recovered from Ms. Johnson's anal area. (Doc. 14-2, pp. 5-6). The report excluded Elkins as the contributor of the hair evidence. (Id.).

Mr. Elkins also provided evidence that Barberton police withheld exculpatory evidence when they failed to turn over the interdepartmental memo which described

5

Earl Mann's arrest and his inculpatory statement regarding Judith Johnson's murder. (Doc. 14-8, pp. 16-22).

*The District Court's Summary Judgment Decision, the Officers' Appeal, and the Parties' Settlement*

The Barberton defendants moved for summary judgment on all claims. On April 28, 2009, the district court granted summary judgment as to some but not all of Mr. Elkins' claims. The surviving claims against the individual officers included a § 1983 claim for a violation of due process based on the officers failure to disclose exculpatory evidence and state law claims of malicious prosecution and loss of consortium. All claims against the City of Barberton were dismissed. The district court concluded that the evidence of the officers' failure to disclose the Mann Memo was sufficient to support Mr. Elkins' Brady claim and his state law malicious prosecution claim. See Elkins, 2009 WL 1150114, at \*\*8-11.

The Barberton Officers filed an interlocutory appeal of the denial of qualified immunity for the Section 1983 claims. The Sixth Circuit affirmed the district court's ruling, and it declined the review of the district court's denial of summary judgment as to the state law malicious prosecution claim. Elkins v. Summit County, 615 F.3d 671 (6th Cir. 2010).

The case returned to district court, and the matter was referred for pre-trial mediation. Barberton's insurers, which included plaintiff Selective and defendant RLI, were notified of the settlement conference. Prior to mediation, Mr. Elkins made a "bottom line" demand of $5.25 million to settle all claims. Elkins stated that if the case did not settle by the close of business November 16, 2010, the settlement demand would increase to $12 million. The case settled at mediation for $5.25 million.

6

*Barberton's Insurers and the Instant Dispute*

Three insurance companies contributed to the settlement paid to Mr. Elkins: National Casualty Company ("National") paying $1 million, Continental Casualty Company ("Continental") paying $1 million, and the plaintiff in the instant case, Selective, paying $3.25 million. Barberton sought coverage from defendant RLI, but RLI denied coverage. RLI did not attend the settlement conference.

National was the primary liability insurance carrier for the City of Barberton between June 29, 1997 and June 29, 1998. Defendant RLI was the excess carrier for the same time period. Continental was the primary insurer between June 19, 1998 and June 29, 1999. Plaintiff Selective was the excess carrier during that same period.

As part of the settlement, Selective was given assignment of rights from the City of Barberton and the individual police officer defendants. Selective filed this lawsuit to seek a declaration of rights as to coverage under the RLI policy. Selective now moves for partial summary judgment, arguing that the malicious prosecution of Mr. Elkins "occurred" for the purpose of insurance coverage when charges were filed against him on June 11, 1998. As a consequence, Selective maintains, coverage was triggered under RLI's policy, whose policy period ended on June 29, 1998. RLI opposes the motion and moves for summary judgment, arguing that the tort of malicious prosecution occurred at the time the officers failed to disclose the Mann Memo, which happened no earlier than January 6, 1999. Because the Selective policy was in effect at that time, RLI argues coverage was triggered under the Selective policy.

7

**II.**

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000) (citing Northland Ins. Co. v. Guardsman Prods., Inc., 141 F.3d 612, 616 (6th Cir. 1998)).

**III.**

The Court must determine based on the relevant insurance policies when the tort of malicious prosecution "occurred." As Selective sees it, the tort of malicious prosecution occurred when charges were brought against Mr. Elkins. If Selective is correct, this occurrence would fall within the policy period provided by the RLI policy – June 29, 1997 and June 29, 1998. On the other hand, RLI argues that the only "occurrence" in this matter occurred at the time the Barberton defendants failed to disclose the Mann Memo to Elkins. Because the Mann Memo was not created until six months after the RLI policy terminated, the failure to disclose does not qualify as an "occurrence" under the policy, making RLI's denial of coverage appropriate.

In order to determine which is the correct position, the Court begins with the language of the applicable insurance policy. Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co., 769 N.E.2d 835, 840 (Ohio 2002) ("The starting point for determining the scope of coverage is the language of insurance polices."). In Ohio, "[a]n insurance policy is a contract whose interpretation is a matter of law." Sharonville v. Am.

8

Employers Ins. Co., 846 N.E.2d 833, 836 (Ohio 2006). Contract terms are to be given their plain and ordinary meaning. Gomolka v. State Auto. Mut. Ins. Co., 436 N.E.2d 1347, 1348 (Ohio 1982). If provisions are susceptible of more than one interpretation, they "will be construed strictly against the insurer and liberally in favor of the insured." King v. Nationwide Ins. Co., 519 N.E.2d 1380, 1383 (Ohio 1988). Additionally, "an exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded." Hybud Equip. Corp. v. Sphere Drake Ins. Co., 597 N.E.2d 1096, 1102 (Ohio 1992).

The RLI excess policy is occurrence based, and it contains the following language relevant[1] to the instant dispute:

> [RLI] will pay on behalf of the insured all sums the insured becomes legally obligated to pay as ultimate net loss because of . . . [p]ersonal injury . . . caused by an occurrence . . . .

The definition of "personal injury" includes "injury, other than bodily injury, arising out of . . . malicious prosecution . . . ."

"Occurrence" is defined as

> with respect to personal injury, an act or series of acts of the same or similar nature committed during this policy period. Such act or series of acts must constitute an offense included in the definition of the term injury in this policy.

---

[1]Selective maintains that the RLI excess policy contains a "following form" endorsement, and, because this is the case, the scope of coverage under the RLI excess policy should be determined with reference to the primary policy that was in effect at the same time – the National Policy. In the Court's view, the issue of whether the RLI policy is a true "follow form" policy will turn out to be a moot question. Because the Court will ultimately decide that the tort of malicious prosecution occurs for coverage purposes at the time charges are filed, it makes little difference whether the underlying National policy or the RLI policy is the operative policy in this instance. The Court accordingly assumes for the sake of argument that the RLI policy language that follows is controlling in this instance.

9

As RLI sees it, there can be no coverage under the RLI policy because the only "occurrence" was the alleged Brady violation identified by the district court. RLI contends that the Brady violation occurred when Barberton's officers failed to disclose the Mann Memo, which occurred no earlier than January 1999. Thus, because the RLI policy period ended in June 1998, there was no coverage for an "occurrence" that occurred six months later.

As the Court sees it, for the purposes of the present dispute, RLI assigns undue significance to the alleged Brady violation. This is not a situation where the district court determined, as a matter of law, that Barberton violated Mr. Elkins' constitutional rights. Instead, the district court concluded that there was enough evidence by which a reasonable jury could find a Brady violation, based on the alleged failure to disclose the Mann Memo. When the case returned from the Sixth Circuit affirmed, Mr. Elkins still had to prove his malicious prosecution claim in order to win a judgment. While the district court's malicious prosecution analysis focused on Barberton's alleged failure to disclose the Mann Memo, there is nothing in that court's opinion (or the opinion of the Sixth Circuit) that would have necessarily foreclosed Mr. Elkins from presenting evidence of other instances of wrongdoing on the part of Barberton police in order to prove his surviving claims. For instance, as noted by the Court of Appeals in dicta,

> Officers allegedly told Johnson's daughter, who discovered a lampshade bearing two bloody hand-prints in Johnson's house following the police investigation, that they did not need the lampshade "because they had enough evidence already." Moreover, an alibi witness, Sue Dalton, testified that, when she informed the officers that she had seen Elkins the night of the murder and did not believe that he committed the crime, the officers allegedly responded, "we got our man, we know for a fact that we have our man." When Dalton continued to protest, the officers allegedly told her that, if she did not distance herself from Elkins, she would end up in jail. Furthermore, one of the officers allegedly falsified a police report to hide evidence that Brooke was unsure that Elkins had attacked her.

10

Elkins v. Summit Cnty., Ohio, 615 F.3d 671, 678 (6th Cir. 2010). In addition there was evidence that during the National/RLI policy period, Barberton officers allegedly failed to preserve biological evidence found at the crime scene; destroyed notes and recordings of witness statements; and ignored evidence of pubic and head hair belonging to someone other than Mr. Elkins that were recovered from Judith Johnson's body.

These examples of alleged misconduct, among others, all took place while RLI's policy was in effect, and there is no reason to believe, had the Elkins civil case gone to trial, that this evidence, to the extent it was admissible, would not have been part of Mr. Elkins' case. This is evidence that might have proved to a jury that the officers acted with malice or without probable cause, but there is no way to know whether this would have been the case, and, in fact, there is no way to know whether a jury would have found that the failure to disclose the Mann Memo was itself a Brady violation. Nothing was ever proven and no final judgment was entered because the case settled before trial. Thus, the alleged failure to disclose the Mann Memo is not relevant to the question of coverage.

This is not to say that because the malicious prosecution claim was never proven to a jury that coverage under the RLI policy was not triggered. Quite to the contrary. Neither the RLI policy nor the National policy require a judgment to trigger an obligation to pay. Instead, under the RLI policy, the insurer must pay where the insured "becomes legally obligated to pay as ultimate net loss because of . . . [p]ersonal injury . . . caused by an occurrence . . . ." In this case, Barberton became legally obligated to pay when it agreed to settle the case for $5.25 million in exchange for dismissal of the case. The "occurrence" was the pattern of misconduct on the part of Barberton, as alleged in the

11

civil complaint, that occurred while the RLI policy was in effect. As noted above, an "occurrence" under the RLI policy is "a series of acts of the same or similar nature committed during this policy period." The "personal injury" in this instance was the "malicious prosecution" of Mr. Elkins beginning with the filing of charges. For the reasons discussed below, the Court is persuaded that the malicious prosecution of Mr. Elkins occurred for coverage purposes when criminal charges were filed.

Ohio courts have not directly faced the issue of when the tort of malicious prosecution "occurs" for coverage purposes, but courts from other jurisdictions have staked out two positions on the subject. The majority of courts have determined that coverage for a malicious prosecution claim is triggered at the time the underlying criminal charges are filed. See Genesis Ins. Co. v. City of Council Bluffs, 677 F.3d 806, 813 (8th Cir. 2012) (collecting cases); City of Erie, Pa. v. Guar. Nat. Ins. Co., 109 F.3d 156, 160 (3d Cir. 1997) (collecting cases). On the other hand, a minority of courts have adopted the rule that the tort of malicious prosecution occurs for coverage purposes at the time the underlying criminal charges are resolved in favor of the defendant. See Am. Safety Cas. Ins. Co. v. City of Waukegan, 678 F.3d 475 (7th Cir. 2012) (applying Illinois law); Sauviac v. Dobbins, 949 So.2d 513, 519-20 (La. Ct. App. 2006).

The minority rule is founded on the idea that because one of the necessary elements of a malicious prosecution claim is termination of criminal proceedings in favor of the plaintiff, a malicious prosecution plaintiff does not state a viable claim until this happens. Thus, in the minority view, insurance coverage is triggered at the same time that the statute of limitations begins to run. See A. Safety Cas. Ins., 678 F.3d at 479-80. The majority of courts have rejected this view, however, first, on the ground that

12

> [the] dates need not necessarily correspond. Reliance on the commencement of the statute of limitation is not dispositive in determining when a tort occurs for insurance purposes. Statutes of limitation and triggering dates for insurance purposes serve distinct functions and reflect different policy concerns. Statutes of limitation function to expedite litigation and discourage stale claims. But when determining when a tort occurs for insurance purposes, courts have generally sought to protect the reasonable expectations of the parties to the insurance contract.

City of Erie, 109 F.3d at 161. As noted by the Third Circuit, "courts have consistently rejected the idea they are bound by the statutes of limitation when seeking to determine when a tort occurs for insurance purposes." Id. (citing cases).[2]

In addition, both the Eighth and Third Circuits further rejected the minority rule for policy reasons. As explained in City of Erie:

> The other theme is that reliance on the "time of favorable termination" to trigger liability has unwise policy implications, for it allows tortfeasors with information about their own potential liability to shift the burden to unwary insurance companies. As the Court of Appeals for the Eighth Circuit noted, "... a contrary rule might well enable plaintiffs to lull an unwary insurer into extending coverage after they perceive an impending difficulty from a suit in which they are already engaged."

Id. at 160-61 (3d Cir. 1997) (quoting Royal Indem. Co. v. Werner, 979 F.2d 1299, 1300 (8th Cir. 1992)).

In adopting the majority rule, both the Eighth and Third Circuit relied on general principles of insurance law provided by the applicable state law. The Eighth Circuit observed that under Iowa law, "[t]he time of 'occurrence' is when the claimant sustains

---

[2]This is true in Ohio, since the date an action accrues and the date coverage is triggered are not necessarily the same. Under the discovery rule, "a cause of action accrues when the plaintiff discovers, or in the exercise of reasonable care should have discovered, that he or she was injured by the wrongful conduct of the defendant." Collins v. Sotka, 81 Ohio St. 3d 506, 507, 692 N.E.2d 581, 582 (1998). However, under an occurrence based policy, coverage is generally triggered when injury occurs, not when damages manifest themselves. See Plum v. W. Am. Ins. Co., 2006-Ohio-452, ¶21, 2006 WL 256881 (Ohio Ct. App. Feb. 3, 2006).

13

damages, not when the act or omission causing the damage takes place." Genesis Ins. Co., 677 F.3d at 814 (quoting Tacker v. Am. Family Mut. Ins. Co., 530 N.W.2d 674, 676 (Iowa 1995). The court accordingly reasoned that

> it is improbable tham the term "personal injury" is used in a technical sense to speak of time when a cause of action has fully matured. It is more likely intended to describe the time when harm begins to ensue, when injury occurs to the person, that is, in this case, when the relevant law suit is filed.

Id. at 813-14. Similarly, the Third Circuit noted that "the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place." City of Erie, 109 F.3d at 162 (quoting Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61-62 (3d Cir.1982)). The City of Erie court reasoned that "defining the timing of an occurrence with reference to the moment at which injurious effects take place would best protect the expectations of the parties entering into an occurrence-based insurance contract." Id.

In predicting whether Ohio courts would adopt the majority or minority rule, this Court looks to relevant case law from Ohio. In Ohio, "when determining whether something constitutes an occurrence under the insurance policy, the focus should be on the injury and its immediately attendant causative circumstances." Worrell v. Daniel, 698 N.E.2d 494, 499 (Ohio Ct. App. 1997). For instance, in one Ohio case, a coverage dispute arose out of an underlying breach of contract and negligence lawsuit, in which homeowners won a judgment from the homebuilder for a failure to make material disclosures. Plum v. W. Am. Ins. Co., Case No. C-050115, 2006 WL 256881 (Ohio Ct. App. Feb. 3, 2006). Under an occurrence based policy, the builder's insurer declined coverage on the ground that the property damage did not become apparent until years

14

after the policy period ended. Id. at *1. In addressing at what point in time coverage was triggered under an occurrence based policy, the court explained that under Ohio law,

> Several theories exist for determining when coverage is triggered under an occurrence-based liability insurance policy. Under the "manifestation trigger," coverage is triggered when property damage becomes known to the owner. Under the "injury-in-fact trigger," coverage is triggered when the damage first occurs. Under the "exposure trigger," coverage is triggered when the first injury-causing conditions occur. Finally, courts often apply the concept of "continuous trigger" if multiple policies are in effect over a period of time.

Id. at *3 (citations omitted). Based on the nature of the underlying damages, the Plum court rejected the idea that a "manifestation trigger" should apply and observed that "'[t]here is no requirement that the damages 'manifest' themselves during the policy period. Rather, it is the damage itself which must occur during the policy period for coverage to be effective.'" Id. at *4 (quoting Trizec Properties, Inc. v. Biltmore Constr. Co., Inc., 767 F.2d 810, 813 (11th Cir. 1985). The court accordingly rejected the idea that injury did not occur until they manifested themselves, and it opted for a continuous trigger. Id.

In another Ohio case, the court was called upon to decide the type of coverage trigger applicable to an asbestos claim. Based on the policy language, the insurer was to provide coverage for "PERSONAL INJURY . . . caused by an OCCURRENCE." Owens-Corning Fiberglas Corp. v. Am. Centennial Ins. Co., 660 N.E.2d 770, 789 (Com. Pl. 1995). An "occurrence" was defined as "an accident or event including continuous or repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY." Id. In considering the nature of the underlying damages (injury resulting from exposure to asbestos), the court concluded that "so long as there is some 'personal injury' during the policy period, the policy is triggered." Id. at 789-90. The court ruled that

15

injury began with first exposure up to death or diagnosis. Id.; See also GenCorp, Inc. v. AIU Ins. Co, 104 F.Supp2d 740, 745-46 (N.D. Ohio 2000) (a environmental contamination case rejecting manifestation trigger and employing "injury-in-fact as the initial triggering event").

Based on this case law, the court is persuaded that Ohio would follow the majority rule. While the types of injury described in the above cases (property damage in Plum and environmental injury in Owens-Corning) are different than the malicious prosecution injury here, the court finds them sufficiently analogous such that they are persuasive in this instance. Both Plum and Owens-Corning stand for the proposition that when determining the triggering event for an occurrence based policy, courts should look to the time when injury began. Similar to the above cases, whether or not anyone was aware that Mr. Elkins' prosecution was improvident at the time it was initiated, the injury to him began the day of his arrest, although it did not become undeniably apparent (to anyone besides Mr. Elkins) until charges were dismissed.

RLI provides little support for its position that Ohio would adopt the rule it proposes, and it provides no support for the idea that Ohio would accept the minority rule. As noted by Selective, RLI's proposed rule is not consistent with either the majority or minority positions. RLI opts neither for the "time of filing" or "time of termination" trigger; instead, it asks that the court take a middle path, for which it offers little persuasive authority. The Court declines to adopt RLI's proposed rule. In sum, the Court concludes that in Ohio the tort of malicious prosecution occurs for the purpose of insurance coverage under an occurrence based policy when criminal charges are filed.

16

**IV.**

For the reasons stated above, Selective's motion for partial summary judgment is granted; RLI's motion for summary judgment is denied; Selective's motion to certify a question of state law is denied as moot.

IT IS SO ORDERED.

                                                  /s/Lesley Wells
                                                  UNITED STATES DISTRICT JUDGE

Date: 13 July 2015